**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**PARKERSBURG DIVISION**

**AMANDA SHUMAKER, on behalf of
C.D.P,**
          **Plaintiff,**

**v.**                                      **Case No. 6:13-cv-23203**

**CAROLYN W. COLVIN,
Acting Commissioner of the
Social Security Administration,**

          **Defendant.**

## PROPOSED FINDINGS AND RECOMMENDATIONS

This action seeks review of the final decision of the Commissioner of Social Security denying the Claimant's application for children's Supplemental Security Income ("SSI") under Title XVI of the Social Security Act. The matter is assigned to the Honorable Thomas E. Johnston, United States District Judge, and was referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are the parties' Motions for Judgment on the Pleadings as articulated in their respective briefs. (ECF Nos. 12, 15).

The undersigned has fully considered the evidence and arguments of counsel. For the following reasons, the undersigned **RECOMMENDS** that Plaintiff's motion for judgment on the pleadings be **DENIED;** that the Commissioner's motion for judgment on the pleadings be **GRANTED;** that the decision of the Commissioner be **AFFIRMED**; and that this case be **DISMISSED**, **with prejudice,** and removed from the docket of the Court.

I.    **Procedural History**

Plaintiff, C.D.P. (hereinafter referred to as "Claimant"), through her mother, Amanda Shumaker, protectively filed an application for children's SSI benefits on September 22, 2010, alleging a disability onset date of May 28, 2006 due to congenital adrenal hyperplasia ("CAH") and 11 beta deficiency with associated complications.[1] (Tr. at 68, 193). The claim was denied initially and upon reconsideration. (*Id.* at 68). Claimant timely requested a hearing, which took place on March 28, 2012 before the Honorable Valerie A. Bawolek, Administrative Law Judge ("ALJ"). (*Id.* at 87-101). By decision dated June 5, 2012, the ALJ determined that Claimant was not disabled under the Social Security Act. (*Id.* at 68-82). The ALJ's decision became the final decision of the Commissioner on August 8, 2013, when the Appeals Council denied Claimant's request for review. (Tr. at 1-4). On September 18, 2013, Claimant brought the present civil action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g). (ECF No. 2). The Commissioner filed an Answer and the Transcript of Proceedings, and both parties have fully briefed the issues. (ECF Nos. 10, 11, 12, 15). Therefore, this matter is ready for resolution.

II.    **Summary of ALJ'S Decision**

A child is disabled under the Social Security Act if he or she "has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted

---

[1]Congenital adrenal hyperplasia ("CAH") is a group of disorders affecting the adrenal glands, which prevents them from producing the correct amount of hormones regulating energy levels, stress levels, salt levels, sugar levels, blood pressure, growth and gender development. ©National Institutes of Health Clinical Center. CAH due to 11-beta-hydroxylase deficiency is caused by a shortage of the 11-beta-hydroxylase enzyme. When 11-beta-hydroxylase is lacking, precursors that are used to form cortisol and corticosterone build up in the adrenal glands and are converted to androgens. The excess production of androgens leads to abnormalities of sexual development, particularly in females. ©Genetics Home Reference, U.S. National Library of Medicine, National Institutes of Health, published Sept. 8, 2014.

or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(i). The regulations require the ALJ to determine a child's disability using a three step sequential evaluation process. 20 U.S.C. § 416.924. At the first step, the ALJ must determine whether the child is engaged in substantial gainful activity. *Id.* If the child is, he or she is found not disabled. *Id.* If the child is not, the second inquiry is whether the child has a medically determinable impairment, or a combination of impairments, that is severe. *Id.* For a child, a medically determinable impairment or combination of impairments is considered *not* severe if it constitutes only a "slight abnormality or a combination of slight abnormalities that causes no more than minimal functional limitations." *Id.* If a severe impairment is present, the third and final inquiry is whether such impairment meets or medically equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 ("the Listing"). *Id.* Although an impairment may not, on its face, meet or medically equal a listed impairment, it is considered to be of listing-level severity when the impairment is the functional equivalent of a listed impairment. 20 C.F.R. § 416.926a. If the claimant's impairment meets, medically equals, or functionally equals an impairment in the Listing, the claimant is found disabled and is awarded benefits. 20 U.S.C. §§ 416.924, 416.926a. If it does not, the claimant is found not disabled.

To determine functional equivalence, the regulations require the ALJ to evaluate the limitations resulting from the child's impairment under six broad domains of functioning, including:

(1) Acquiring and using information;
(2) Attending and completing tasks;
(3) Interacting and relating to others;
(4) Moving about and manipulating objects;
(5) Self-care; and

(6)  Health and physical well-being.

*Id.* at 416.926a(b)(1); Social Security Ruling ("SSR") 09-1p. If the child has "marked" limitations in two of the six domains, or "extreme" limitations in one of them, the child's impairment will functionally meet a listing.[2] *Id.* at 416.926a(d). "This technique for determining functional equivalence accounts for all of the effects of a child's impairments singly and in combination—the interactive and cumulative effects of the impairments—because it starts with a consideration of actual functioning in all settings." SSR 09-1p. The SSA calls this technique the "whole child" approach. *Id.*

In this particular case, the ALJ determined that Claimant satisfied the first inquiry, because she had not engaged in substantial gainful activity. (Tr. at 71, Finding No. 2). The alleged disability onset date of May 28, 2006 was Claimant's date of birth, and she was only a preschooler at the time the application for benefits was filed. Under the second inquiry, the ALJ found that Claimant suffered from severe impairments of CAH and attention deficit hyperactivity disorder ("ADHD"). (Tr. at 71, Finding No. 3).

---

[2]  20 C.F.R. § 416.926a(e) defines "marked" and "extreme" limitations, in relevant part, as follows:

> [Y]ou have a "marked" limitation in a domain when your impairment(s) interferes seriously with your ability to independently initiate, sustain, or complete activities. Your day-to-day functioning may be seriously limited when your impairment(s) limits only one activity or when the interactive and cumulative effects of your impairment(s) limit several activities. "Marked" limitation also means a limitation that is "more than moderate" but "less than extreme." It is the equivalent of the functioning ... [found] on standardized testing with scores that are at least two, but less than three, standard deviations below the mean.

> [Y]ou have an "extreme" limitation in a domain when your impairment(s) interferes very seriously with your ability to independently initiate, sustain, or complete activities. Your day-to-day functioning may be very seriously limited when your impairment(s) limits only one activity or when the interactive and cumulative effects of your impairment(s) limit several activities. "Extreme" limitation also means a limitation that is "more than marked." "Extreme" limitation is the rating [given] to the worst limitations. However, "extreme limitation" does not necessarily mean a total lack or loss of ability to function. It is the equivalent of the functioning ... [found] on standardized testing with scores that are at least three standard deviations below the mean.

The ALJ noted that Claimant's CAH was diagnosed shortly after birth, and she had undergone surgery at three months of age without complication. Claimant's diagnosis of ADHD was made in November 2010 during an evaluation by a state agency consultant. (*Id.* at 72). At the third and final inquiry, the ALJ concluded that Claimant's impairments did not meet, medically equal, or functionally equal the level of severity of any impairment contained in the Listing. (Tr. at 72-81, Finding Nos. 4 and 5). Therefore, Claimant was not under a disability as defined in the Social Security Act and was not entitled to benefits. (Tr. at 81-82, Finding No. 6).

## III.   <u>Scope of Review</u>

While 42 U.S.C. §405(g) "authorizes judicial review of the Social Security Commissioner's denial of social security benefits," *Hines v. Barnhart,* 453 F.3d 559, 561 (4th Cir. 2006), the scope of review is extremely limited. The sole issue before the court is whether the final decision of the Commissioner denying benefits was "reached through application of the correct legal standard" and is supported by substantial evidence. *Hancock v. Astrue,* 667 F.3d 470, 472 (4th Cir. 2012) (quoting *Johnson v. Barnhart,* 434 F. 3d 650,653 (4th Cir. 2005). The United States Court of Appeals for the Fourth Circuit has defined substantial evidence as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'

*Blalock v. Richardson*, 483 F.2d 773, 776 (4th Cir. 1972) (quoting *Laws v. Cellebreze*, 368 F.2d 640, 642 (4th Cir. 1966)). When reviewing a final decision for substantial evidence, the court does not evaluate the case *de novo*, *Oppenheim v. Finch,* 495 F.2d 396, 397 (4th Cir.  1974), make credibility determinations, or substitute its judgment for

that of the Commissioner. *Craig v. Chater,* 76 F.3d 585, 589 (4th Cir. 1996). Moreover, the Commissioner, not the court, is charged with resolving conflicts in the evidence. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the ALJ." *Hancock,* 667 F.3d at 472. Consequently, the question to be answered by the reviewing court is "not whether the claimant is disabled, but whether the ALJ's finding of no disability is supported by substantial evidence." *Johnson,* 434 F.3d at 653, citing *Craig v. Chater,* 76 F.3d 585, 589 (4th Cir. 2001). Nevertheless, courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." *Oppenheim*, 495 F.2d at 397.

## IV.   Claimant's Background

Claimant was five years old at the time of the administrative hearing and attended the local primary school. (Tr. at 99). She was enrolled in an age-appropriate grade and did not receive special education. Claimant lived with her mother and sister.

## V.   Claimant's Challenges to the Commissioner's Decision

Claimant asserts that the Commissioner's decision is not supported by substantial  evidence, because the ALJ erred in two ways. First, she failed to obtain an updated medical opinion. (ECF No. 12 at 11-13). According to Claimant, the ALJ relied heavily upon the testimony of an agency consultant, Dr. Brendemuehl, who admitted that she had only reviewed Claimant's treatment records through June 2010. However, treatment notes prepared through 2011 were available prior to the administrative hearing, and 70 pages of new or previously overlooked records dated between 2008 and April 24, 2012 were submitted after the hearing. Given that these records may have

prompted Dr. Brendemuehl to modify her testimony, the ALJ or Appeals Council should have obtained an updated opinion before issuing a final determination. In addition, Claimant argues that without an updated medical opinion, the ALJ failed to base her disability determination on a longitudinal view of the records, as required by the social security regulations. (*Id.*).

Second, Claimant contends that the ALJ committed reversible error by failing to find that Claimant had "marked" limitations in the functional domains of "attending and completing tasks" and "health and physical well-being." (ECF No. 12 at 13-17). Claimant asserts that the examples used in SSR 09-4p to demonstrate limitations in the domain of attending and completing tasks essentially mirror her behaviors as observed by her mother, and as were documented in her psychological evaluation. In particular, Claimant alleges that her poor impulse control, steroid rages, and severely impaired persistence and pace support a finding of marked limitations in that domain. Furthermore, Claimant states that her long-term need for high doses of steroids, with their harsh side effects, certainly places her in the category of individuals with "medical fragility," as was envisioned by SSR 09-8p, when explaining additional limitations to consider in the domain of health and well-being.

In response, the Commissioner refutes Claimant's contention that an updated medical opinion was necessary, emphasizing that the two medical experts who testified at the administrative hearing had access to the full medical record at that time, and Claimant's attorney was free to ask them questions about any of the treatment notes, including those prepared in 2011. (ECF No. 15 at 15-16). When additional records were submitted after the hearing, Claimant's attorney also had the option of requesting a supplemental hearing, or additional opinions, but made neither request. Therefore,

Claimant should not be permitted at this stage of the proceedings to second guess the ALJ's conclusion that additional opinions were unnecessary. The Commissioner adds that under SSR 96-6p, the ALJ has broad discretion to determine when supplementary opinions are needed. Obviously, the ALJ did not find the new materials to merit further inquiry, and Claimant has not stated a sufficient basis to challenge the ALJ's exercise of discretion. (*Id.*). As far as Claimant's argument that she functionally meets a listed impairment, the Commissioner argues that substantial evidence supports the ALJ's determination that Claimant's limitations are less than marked in all six domains of functioning.

## VI.    <u>Relevant Medical Information</u>

The Court has reviewed all evidence of record, including the medical documentation.  To the extent medical information is relevant to the issues in dispute, the undersigned addresses it in the discussion below.

### A.    *Treatment Records*

On August 11, 2006, Dr. William P. Zipf, a pediatric endocrinologist practicing in Columbus, Ohio, wrote a letter to Dr. Mary Niland, Claimant's pediatrician, summarizing Claimant's care and treatment beginning from her birth on May 28, 2006 through the date of the correspondence. (Tr. at 550-54). Dr. Zipf reported a relatively benign prenatal course, with a normal labor and uncomplicated delivery. However, hormonal testing performed on Claimant after birth was abnormal, as were adrenal and androgen studies. Claimant's hormonal pattern suggested nonclassical CAH, versus 11-hydroxylase deficiency CAH, although further testing was needed to pinpoint the exact genetic form of Claimant's CAH. (Tr. at 553). Despite Claimant's adrenal gland disorder, Dr. Zipf commented that her general health had been excellent with no symptoms of

illness. Her linear growth was in the 50th percentile, and her weight was following along the 90th percentile. (Tr. at 552). Claimant's physical examination was normal. Dr. Zipf planned to treat Claimant's CAH with hydrocortisone therapy and steroid supplementation at times of severe illness and stress. (Tr. at 553).

On October 24, 2006, Claimant underwent a surgical procedure related to her CAH, which was performed by Dr. Rama Jayanthi at Columbus Children's Hospital. (Tr. at 312-13). The procedure went well without complication. (Tr. at 310). Dr. Jayanthi instructed Claimant to return in six months for re-examination.

Approximately one year later, on December 6, 2007, Dr. Jayanthi wrote a letter to Dr. Niland reporting on a follow-up examination of Claimant. (Tr. at 549). Dr. Jayanthi stated that Claimant was doing quite nicely, with no long-term complications related to surgery. She was presently on chronic steroid treatment for her CAH. Dr. Jayanthi recommended that Claimant return in one year for follow-up. (*Id.*).

On May 28, 2008, Dr. Niland performed a well-child examination of Claimant on her second birthday. (Tr. at 542-45). Claimant was observed to be well developed, well nourished, and in no acute distress. Her physical examination was unremarkable, except for a dry rash on her checks and a scar from her previous surgery.  Her growth and development were noted to be appropriate for her age, and she was told to return in one year. (Tr. at 544).

Claimant initiated treatment with a new pediatrician, Dr. Sofia Khan, on November 20, 2008 at Charleston Area Medical Center ("CAMC"). (Tr. at 599-601). Dr. Khan took a prenatal, birth, family, social, and past medical history. She documented that Claimant and her sibling both had CAH. However, Claimant had no past history of illnesses and her developmental milestones were appropriate for her age. On the day of

her visit, Claimant was complaining of vomiting and diarrhea, but the symptoms were resolving. On physical examination, Dr. Khan noted the signs of prior surgery and also documented an irregular heartbeat. (Tr. at 600). Otherwise, the findings were normal. Dr. Khan recommended a flu vaccination, follow-up with an endocrinologist for management of Claimant's CAH, and an EKG to rule out cardiac arrhythmia. (*Id.*)

On February 11, 2009, Dr. Michael Torchinsky, a pediatric endocrinologist at West Virginia University in Charleston ("WVH Charleston"), wrote a letter to Dr. Khan detailing his examination of Claimant. (Tr. at 672-73). Dr. Torchinsky confirmed Claimant's diagnosis of CAH. He reported that Claimant's physical examination was essentially normal, and laboratory work and a bone age scan were ordered. He made some recommendations to adjust Claimant's hydrocortisone regimen and suggested that she follow-up in the pediatric endocrine clinic every three month. The bone age scan was later read as normal. (Tr. at 671).

Dr. Jayanthi wrote a letter to Dr. Khan on June 14, 2009 reporting on a follow-up visit with Claimant. (Tr. at 257-58). Dr. Jayanthi indicated that Claimant was "growing and thriving quite nicely," since her surgery several years earlier; in fact, she was "doing great." Dr. Jayanthi expected that Claimant might require a second surgery as she approached puberty, but in the meantime would continue to see her once a year to check on her status.

A routine visit at the pediatric endocrine clinic on August 31, 2009 also revealed normal growth and development. (Tr. at 351). According to Kevin Lewis, R.N., Claimant's height was in the 50th percentile, her weight was in the 75th percentile, and her physical examination was unremarkable. Her laboratory results fell within normal ranges, her blood pressure was normal, and her bone age scan was consistent with her

age of 3 years and 3 months. (*Id.*). Dr. Khan made similar observations and findings two months later in November 2009 during a well-child visit. (Tr. at 399-400). She documented that Claimant's growth and development were normal, although she was too heavy, with a BMI in the 95th percentile. However, Claimant's mother reported no concerns. She confirmed that Claimant was meeting normal milestones and had good behavior. (*Id.*).

On January 21, 2010, Dr. Sachin Bendre, an endocrinologist at WVU Charleston, examined Claimant in the pediatric endocrine clinic. (Tr. at 347-48). He indicated that Claimant had done well on her medication regimen for CAH secondary to 11-beta-HSD deficiency. Her last 11 DOC levels were normal; here appetite was good; she slept well; and had no evidence of headaches, vision changes, or abdominal distress. Claimant's physical examination was unremarkable except for diaper area rash and surgical scarring. Her weight was at the 90th percentile, and her height was at the 50th percentile. Dr. Bendre planned on checking laboratory values and considering a reduction in Claimant's hydrocortisone dose, if appropriate. (*Id.*). At a follow-up visit on April 21, 2010, Dr. Bendre noted that Claimant's weight had increased; accordingly, he counseled Claimant's mother to feed her lower calorie foods and to encourage exercise. (Tr. at 342-43).

Claimant saw Dr. Jayanthi on June 17, 2010 for her annual follow-up visit. (Tr. at 297). Dr. Jayanthi wrote Dr. Bendre, remarking that Claimant had continued to do well since the 2006 surgery. Dr. Jayanthi still planned to consider a second surgery around Claimant's puberty, and until then would see Claimant periodically for follow-up, with the next appointment "in a couple of years." (*Id.*).

On July 1, 2010, Claimant was admitted to CAMC's Women and Children's

Hospital with difficulty breathing, cough, congestion, and subjective low grade fever. (Tr. at 333-34). Because of her shortness of breath, she was placed on an albuterol nebulizer every four hours as needed, and her hydrocortisone was tripled for one day, then doubled. After two nebulizer treatments, some intravenous treatments, and additional hydrocortisone, Claimant's breathing issues resolved. She was discharged on July 2, 2010 in stable condition with instructions to increase her hydrocortisone for a few days and use the nebulizer as needed for shortness of breath. (Tr. at 334).

Claimant was noted to be doing well on July 24, 2010 at a follow-up visit at the WVU Charleston pediatric clinic. (Tr. at 331-32). She had gained weight and had grown 4.1 centimeters. Her CAH was stable on medication. A bone age scan was ordered, and was later read as being absolutely consistent with her chronological age of 4 years and 2 months. (Tr. at 442).

On July 29, 2010, Dr. Bendre examined Claimant in the pediatric endocrine clinic. (Tr. at 329-30). He acknowledged Claimant's recent hospitalization, but indicated that otherwise, she had been doing well. Claimant was developmentally appropriate, with a normal bone age scan and recent hormone levels within the normal range. He decided to repeat the studies and see Claimant in follow-up in three months. (*Id.*). Dr. Bendre saw Claimant again on October 29, 2010 and wrote a letter to Dr. Kahn reporting on the visit. (Tr. at 322-23). He noted that Claimant was 4 1/2 years old with CAH due to 11 beta hydroxylase deficiency. Claimant had been seen in the Emergency Room the prior week after having a reaction to penicillin, but had done well with stress steroids. She had grown 5.1 centimeters and gained 1.9 kilograms in three months, had normal laboratory results, and a bone age scan done in January was consistent with her chronological age. Dr. Bendre commented that Claimant's recent growth spurt, which

placed her in the 95th percentile for weight and the 75th percentile for height, might have been related to her use of stress steroids or inadequate suppression of her adrenal hormones. He intended to check her levels, order a repeat bone age scan to rule out advance maturation, and see her back in the clinic in three months. (*Id.*). The bone age scan was performed and most closely resembled that of a female aged 5 years. Since Claimant was 4 years and 5 months old, and the standard deviation was 8 months, the bone age scan was interpreted to be within normal limits. (Tr. at 324).

Dr. Bendre wrote to Dr. Khan again on February 18, 2011 regarding his examination of Claimant on that date. (Tr. at 573-74). He remarked that Claimant was doing well on her current medication regimen, with normal sleep, appetite, and energy levels. Her weight remained in the 95th percentile, and her height was in the 50th percentile. Developmentally, Claimant was age appropriate with no obvious focal neuro deficits. Dr. Bendre decided to increase Claimant's medication slightly, repeat her laboratory testing in a couple of weeks to see if the medication adjustment was beneficial, and see Claimant in three months. (*Id.*).

On May 12, 2011, Claimant was seen by Dr. Khan for her 5-year well-child visit. (Tr. at 592-93). Claimant's mother complained that Claimant had been having behavioral problems, including temper tantrums. She reported that Claimant urinated frequently and needed to wear diapers at night. She slept from 11 p.m. to 9 a.m. After discussing Claimant's diet, Dr. Khan counseled Claimant's mother to avoid giving Claimant sugary drinks and to provide a healthy diet. Dr. Khan also explained the need for consistent discipline. Claimant's physical examination was unremarkable, and Dr. Khan noted that her development was appropriate for her age. Claimant did appear to have some problems with her eyesight and needed to lose weight. (*Id.*).

Claimant returned to the pediatric endocrine clinic on June 29, 2011 and saw Dr. Bendre. (Tr. at 566-67). Dr. Bendre reported to Dr. Khan that Claimant was doing well on her medication, although her mother had described her as being hyperactive and not listening well. According to Dr. Bendre, Claimant's mother thought Claimant drank a lot of water and tea and went to the bathroom frequently. Her physical examination was normal, and her weight and height were at the same percentiles as they had been previously. Dr. Bendre wrote that he told Claimant's mother to quit giving her tea as he felt the tea may be causing Claimant's hyperactivity, increased urination, and might also increase her blood pressure. He ordered laboratory studies and recommended that Claimant return to the clinic in four months. (*Id.*).

In September and December 2011, Claimant had two episodes of cold-like symptoms that required treatment. (Tr. at 584-91). The more serious episode caused Claimant's mother to take her to the Emergency Department where she received nebulizer treatments, prednisone, and antibiotics. (Tr. at 584). A few days later, on December 5, 2011, Claimant was seen by Dr. Khan for follow-up. Dr. Khan documented that Claimant was alert, active, and playful, but still had some wheezing and a watery nasal discharge. Her condition appeared to be improving, so Dr. Khan recommended that she continue with the medications already prescribed and return in one week. (*Id.*).

Two days later, Claimant was seen by Dr. Amanda Dye in the pediatric endocrine clinic, and Dr. Dye wrote a summary note of the visit to Dr. Khan. (Tr. at 559-60). Dr. Dye recounted that Claimant had recently suffered from an upper respiratory illness that required some changes to her normal medication regimen, but that she had now returned to baseline with an appropriate energy level. Claimant's mother reported that Claimant continued to have excessive thirst and excessive urination, but voiced no other

- 14 -

concerns. Claimant's physical examination was essentially normal. Her weight remained at the 95th percentile, and her height was between the 50th and 75th percentile. Dr. Dye described Claimant as "hyper" in the examining room. Dr. Dye assessed Claimant's growth velocity as normal, although her weight was a little concerning. Dr. Dye did discuss dietary and exercise modification with Claimant's mother. She also suggested that Claimant's should be transitioned to a tablet form of medication in the future. (Tr. at 560). Dr. Dye ordered a bone age scan, which was interpreted as being consistent with a patient 5 years and 9 months of age. As Claimant was 5 years and 6 months old, the test was deemed to be normal. (Tr. at 562).

On March 8, 2012, Claimant's mother took her to see Dr. Khan with the chief complaint of excessive coughing. (Tr. at 579-80). Claimant's mother stated that Claimant got out of breath easily and coughed to the point of vomiting. She had lots of nasal drainage, and expelled thick greenish phlegm. Her symptoms improved with antibiotic treatment for sinusitis, but appeared again one week after treatment ended. Dr. Khan examined Claimant and diagnosed a chronic sinus infection. She prescribed Omnicef by mouth for 28 days, a sinus rinse, ordered a CT scan of the sinuses, and an ENT consult. (*Id.*). The CT scan revealed multiple areas of mild mucosal thickening, left greater than the right. (Tr. at 578).

On March 29, 2012, Claimant was admitted to CAMC Women and Children's Hospital through the Emergency Department with symptoms of fever and labored breathing. (Tr. at 699-710). A strep screen in the Emergency Department was positive, and Claimant's potassium level was low. Once admitted, Claimant was evaluated by a pediatric pulmonologist, Dr. Kevin Maupin, who took a history from Claimant's mother. She reported that ever since Claimant had started kindergarten, she had been sick with

some sort of respiratory-related illness. She described Claimant as being a good student, however. On physical examination, Claimant was found to be alert and eating a chocolate chip cookie. She had an allergic discharge from her eyes, and enlarged nodes in her neck. Virology testing was positive for parainfluenza Type 3. Claimant was diagnosed with a mild intermittent cough and wheeze; the flu, type 3; allergic rhinitis; CAH; increased tonsils and adenoids; snoring and sleep disorder; and nocturnal bedwetting likely due to her snoring and sleep disorder. (Tr. at 706-710). Dr. Maupin prescribed treatments for Claimant's flu and recommended an outpatient sleep study to be performed after discharge from the hospital, and some allergy testing. (*Id*). Claimant was discharged on March 31, 2012 in stable condition, with various medications and instructions to follow-up with Dr. Bendre, Dr. Khan, and Dr. Maupin.

Claimant saw Dr. Khan on April 10, 2012. (Tr. at 715-16). At that time, she was stable with no respiratory distress. Dr. Khan suspected that Claimant had asthma and completed an asthma management plan. She suggested that Claimant follow-up with Dr. Maupin and Dr. Bendre and continue taking the medications prescribed for her.

On April 24, 2012, Claimant followed-up with Dr. Bendre. (Tr. at 628). Claimant's mother reported that Claimant was doing well in school, but was having behavioral problems. She described Claimant as very defiant, not listening, and getting into trouble. In addition, Claimant's mother stated that Claimant snored loudly when she slept and had very large tonsils and adenoids. Dr. Bendre found Claimant's physical examination to be unremarkable. He recommended that she continue on the same course of medication, but suggested that she eat a healthier diet. Dr. Bendre also recommended a psychiatric evaluation to address Claimant's behavioral issues. (Tr. at 629).

Claimant presented to the CAMC Sleep Center on July 20, 2012 to undergo an outpatient sleep study for snoring and restless sleep. (Tr. at 695-96). According to her mother, Claimant's bedtime in the summer was 10:30 p.m. until 9:00 or 10:00 a.m. and during the school year, Claimant slept from 9:00 p.m. until 6:30 a.m. Claimant did not take naps. She was having behavioral problems at school with aggression and occasional headaches. Claimant had a history of chronic obstruction of her nose, occasional asthma, and excessive weight for her height. Dr. George Zaldivar, Medical Director of the Sleep Center, evaluated Claimant and assessed her with probable obstructive sleep apnea. He planned an overnight sleep study. The study revealed sleep efficiency of 93.7%. (Tr. at 693). Claimant awoke 3 times during the night, for a total of 10. 7 minutes, and slept a total of 350.7 minutes. She had six episodes of hypopnea with one having a minimum oxygen saturation level of 87%. During REM sleep, her oxygen saturation level was 93%. There was no evidence of limb movements. (*Id.*).

On September 1, 2012, Claimant's mother took her to the Emergency Department at CAMC's Women and Children's Hospital when she complained of feeling unwell and began to run a fever. (Tr. at 688-89). After giving Claimant antibiotics and fluids, the Emergency Department physician decided to admit Claimant for overnight observation to rule out bacteremia. (*Id.*). In light of Claimant's complaint of headache, a CT scan of the head was performed to rule out encephalitis. The scan showed no evidence of any acute process. (Tr. at 690). In addition, to evaluate Claimant's complaints of abdominal pain, a complete abdominal series of x-rays were performed, as well as a chest x-ray. All of these films were negative for evidence of acute disease. (Tr. at 691)

On October 18, 2012, Claimant had her first visit with Dr. Michael Harris, an ophthalmologist, after failing a vision test at school. (Tr. at 42-54). Claimant was six

years old at the time and complained of having poor vision in both eyes for approximately one year. She also complained of headaches. After performing a complete eye examination, Dr. Harris diagnosed Claimant with farsightedness, regular astigmatism, headache, and pseudo papilledema. He prescribed eyeglasses to correct her visual acuity and function. He told Claimant to return in three months for follow-up. (Tr. at 54).

On November 8, 2012, Claimant saw Dr. Khan for a well-child evaluation. (Tr. at 711-12). She was doing well, with no complaints. Her behavior was noted to be "good." Claimant's physical examination was normal; and all developmental milestones had been obtained.

Claimant saw Dr. Harris in follow-up on November 26, 2012 and reported that the quality of her vision with glasses was much better. In addition, she stated that her headaches had essentially resolved since she began wearing glasses. (Tr. at 53-55). At her next visit with Dr. Harris on February 26, 2013, Claimant again reported fewer headaches and improved school work since she started wearing glasses. However, at this visit, Dr. Harris's examination revealed some changes related to the papilledema. Accordingly, he referred Claimant to a neurologist, Dr. Taravath, for further evaluation. (Tr. at 56).

On April 30, 2013, Dr. Sasidharan Taravath evaluated Claimant at the pediatric neurology clinic for headaches possibly related to a pseudo papilledema. (Tr. at 38-39). Dr. Taravath took a history, documenting that Claimant was six years old, in the first grade, and living with her mother and sister. She had a normal birth and was meeting all developmental milestones. He reviewed her medical history, noting her CAH, asthma, sleep apnea, allergies, visual issues, and occasional headaches. Dr. Taravath performed a

neurological examination, which was completely normal. Based upon the history and examination, Dr. Taravath suspected that Claimant had migraine headaches. He advised Claimant to keep a headache diary and recommended a brain MRI and a polysomnogram with end tidal CO2. (Tr. at 39). The brain MRI was performed on May 13, 2013 and reflected a severe Chiari 1 malformation[3] with mild cord edema and an element of basilar invagination at the level of the dens. (Tr. at 37).

### B.    Functional Assessments

On November 18, 2010, Mareda L. Reynolds, M.A., Licensed Psychologist, performed a mental assessment on Claimant, which included conducting a clinical interview, a mental status examination, and a parent interview, and administering the Wechsler Preschool Primary Scale of Intelligence ("WPPSI-III"). (Tr. at 375-78). Ms. Reynolds observed that Claimant was four years old and attended pre-school. She did not require special education. Her presenting problems included being hyperactive, impulsive, and aggressive. Ms. Reynolds noted that Claimant was unable to remain seated during the interview, hid under the table, threw her sister to the floor and hit her, handled objects in the room, scraped her fingernails along the wall, tried to leave the

---

[3] Chiari malformations (CMs) are structural defects in the cerebellum, the part of the brain that controls balance. *Type I* involves the extension of the cerebellar tonsils (the lower part of the cerebellum) into the foramen magnum, without involving the brain stem. Normally, only the spinal cord passes through this opening. Type I—which may not cause symptoms—is the most common form of CM and is usually first noticed in adolescence or adulthood, often by accident during an examination for another condition.

Individuals with CM may complain of neck pain, balance problems, muscle weakness, numbness or other abnormal feelings in the arms or legs, dizziness, vision problems, difficulty swallowing, ringing or buzzing in the ears, hearing loss, vomiting, insomnia, depression, or headache made worse by coughing or straining. Hand coordination and fine motor skills may be affected. Symptoms may change for some individuals, depending on the buildup of CSF and resulting pressure on the tissues and nerves. Persons with a Type I CM may not have symptoms.

**The above information was prepared by the Office of Communications and Public Liaison, National Institute of Neurological Disorders and Stroke, National Institutes of Health, Bethesda, MD. Last updated April 16, 2014**

room, bit her sleeve, and attempted to tear her shoe apart. (Tr. at 376). Claimant's affect was broad and appropriate. She spoke in simple sentences with adequate grammar and without evidence of active thought disorder. Her memory appeared mildly to moderately impaired, and her concentration and attention were moderately impaired. Claimant's persistence and pace seemed severely impaired based upon Ms. Reynold's observations. (Tr. at 377). Claimant scored in the average range on the WPPSI-III, and the scores were determined to be valid. Functionally, Claimant was found to be socially aggressive, generally able to care for her activities of daily living, and able to communicate effectively. Ms. Reynolds assessed Claimant with ADHD based upon parental report and clinical observation. (Tr. at 378).

On December 28, 2010, SSA consultant, Dr. Uma Reddy, a pediatrician, submitted a Childhood Disability Evaluation Form. (Tr. at 380-87). Dr. Reddy indicated that Rosemary L. Smith, Psy.D., a clinical psychologist, had provided input to the findings contained in the form. (Tr. at 381, 387). Dr. Reddy found that Claimant had two impairments, ADHD, not otherwise specified, and CAH. (Tr. at 380). She found the impairments or combination of impairments to be severe, but did not believe that they met, medical equaled, or functionally equaled an impairment contained in the Listing. (*Id.*). Specifically, when evaluating functional equivalence, Dr. Reddy concluded that Claimant had no limitation in the domain of "acquiring and using information." (Tr. at 382). She based this conclusion largely upon Claimant's average intellectual functioning. Next, Dr. Reddy determined that Claimant had a less than marked limitation in the domain of "attending and completing tasks." (*Id.*). According to Dr. Reddy, Claimant's teacher denied that Claimant had limitations in any of the activities in this domain, but in light of the observations of Ms. Reynolds, Dr. Reddy

acknowledged some moderate limitation. As to the domain of "interacting and relating with others," Dr. Reddy found Claimant to have less than marked limitations. (*Id.*). Although Claimant's teacher did not report concerns, Claimant's disruptive behavior during the mental assessment indicated some problems. Dr. Reddy also opined that Claimant had less than marked limitations in the domain of "moving about and manipulating objects." (Tr. at 383). She noted Claimant's medical conditions and her limited exertional activities, but also indicated that Claimant did adequately with physical activities. Claimant had less than marked limitation in the domain of "caring for yourself" given that she was generally self-sufficient except for some occasional bed-wetting. (*Id.*). Lastly, in the domain of "health and physical well-being," Dr. Reddy determined that Claimant had less than marked limitations. (*Id.*). Although Dr. Reddy did not provide any detail below the checkbox, on the following page, she summarized relevant factors regarding Claimant's medical history and physical development. Dr. Reddy stated that Claimant was doing well on her current medication regimen for CAH and was developmentally appropriate for her age. (Tr. at 385). Her surgery had proceeded without complication, and follow-up visits revealed no difficulties. Claimant seemed to be functioning well at school.

On March 24, 2011, a second Childhood Disability Evaluation Form was submitted by SSA consultant, Dr. Thomas Lauderman, a family medicine specialist. (Tr. at 534-41). Dr. Lauderman received input from Bob Marinelli, Ed.D, a counseling psychologist, when completing the form. (Tr. at 534, 541). Dr. Lauderman reviewed all pertinent evidence in the file, including the assessment submitted by Dr. Reddy, and agreed with her findings. Looking closely at reconsideration allegations submitted by Claimant's mother pertaining to Claimant's chronic medical conditions, Dr. Lauderman

still concluded that Claimant's limitations in the domain of "health and physical well-being" were less than marked. (Tr. at 536, 539).

## VII.    <u>Discussion</u>

Claimant contends that the combination of her severe impairments of ADHD and CAH, with its attendant steroid dependency, functionally equals an impairment contained in the Listing. Claimant alleges that the ALJ failed to make the correct disability finding because she relied upon an uninformed medical opinion, and performed an inadequate assessment of the evidence under the six functional domains. Having thoroughly considered Claimant's arguments, the undersigned finds them to be without merit.

### A.    *Reliability of Medical Opinion*

Claimant specifically complains that the ALJ gave significant weight to the opinion of Dr. Judith Brendemuehl, a medical doctor from Logan, West Virginia who appeared in person and testified at the March 28, 2012 administrative hearing. (Tr. at 89-93). Claimant stresses that Dr. Brendemuehl only reviewed Claimant's treatment records through December 2010, and thus based her opinions on medical information that was outdated by the time of the administrative hearing. Claimant supplemented the medical evidence after the hearing by supplying the ALJ with treatment records through April 24, 2012. Accordingly, Claimant contends that the ALJ should have obtained an updated medical opinion that took into account the new treatment records. Only by doing so could the ALJ fulfill her obligation to consider the "whole child" and the "longitudinal" effects of her impairments.

The record reflects that at the time of the March 2012 administrative hearing, Claimant had submitted treatment records dated May 30, 2006 through January 3,

2011. In addition, the file contained disability-related development records, such as function reports, reports of contacts, and teacher questionnaires, dated September 29, 2010 through February 19, 2012. (Tr. at 84-86, 89). At the hearing, the ALJ considered testimony from Dr. Brendemuehl regarding Claimant's medical conditions, a summary of her treatment through 2010, and her expected prognosis given the nature of her disease, her progress over five years, and her tolerance of the medication regimen. (Tr. at 91-93). Dr. Brendemuehl opined that Claimant did not meet or equal any listed impairment based upon the record. Claimant's counsel was given the opportunity to question Dr. Brendemuehl, but asked no questions. (Tr. at 93). A second medical expert, Dr. Joseph Carver, also testified at the hearing. (Tr. at 93-95). Dr. Carver, a clinical psychologist, provided opinions related to Claimant's ADHD. In particular, he stated that based upon the school records and the examination of Claimant by Dr. Reynolds, he felt that while Claimant had situational hyperactivity, her functional limitations were not marked. Once again, Claimant's attorney was given an opportunity to question Dr. Carver, but declined. (Tr. at 95).

After the medical experts provided their opinions, Claimant's mother testified regarding Claimant's recent issues; primarily, about her behavioral problems and recurring respiratory infections. (Tr. at 95-99). At the conclusion of the testimony, the ALJ and Claimant's counsel discussed the need to supplement the record, although the ALJ expressed some skepticism that records related to respiratory infections would be significant to the experts' opinions. However, the ALJ kept the record open thirty days to allow Claimant the chance to supplement the evidence with updated treatment notes and a teacher questionnaire. (Tr. at 100-101). Claimant supplied various school records and treatment records dated May 28, 2006 through April 24, 2012. (Tr. at 85-86). The

treatment records documented some behavioral problems, chronic sinusitis, sleep disturbances, bed-wetting, excessive thirst and urination, and a bout of the flu and strep throat. Most of the issues had appeared to some degree in the records already in evidence.

On June 5, 2012, the ALJ issued her written decision. In the decision, the ALJ explicitly incorporated all of the treatment and disability-related records, including the records submitted after the administrative hearing, and she discussed specific sections of the records that informed her determination. (Tr. at 74, 76-80). In addition, the ALJ addressed the opinion evidence, which was provided by Dr. Brendemuehl, Dr. Carver, Ms. Reynolds, Dr. Reddy, Dr. Smith, Dr. Lauderman, and Dr. Marinelli, noting that the opinion evidence supplied by these experts was internally consistent when considered as a whole, and was consistent, taken separately or together, with the objective medical evidence of record. (Tr. at 74-75). Therefore, the ALJ gave significant weight to *all* of the experts, not just Dr. Brendemuehl. It is plain from the ALJ's discussion that she reviewed the supplemental records and did not find them inconsistent with or contrary to the experts' opinions.

Social Security Ruling 96-6p provides that an ALJ must obtain an updated opinion from a medical expert when "additional medical evidence is received that in the opinion of the administrative law judge ... may change the State agency medical or psychological consultant's finding that the impairment(s) is not equivalent in severity to any impairment in the Listing of Impairments." 1996 WL 374180, at *4 (S.S.A. July 2, 1996). Here, the treatment records submitted after the hearing included a few visits with Dr. Bendre and Dr. Khan where Claimant's mother reported that Claimant was hyperactive and had temper tantrums, and that she drank a lot of tea and urinated

excessively. Claimant's mother was told to quit giving Claimant tea because that beverage could be contributing to all of these symptoms. The records also included several hospital and office visits revolving around Claimant's upper respiratory, flu-related symptoms. She was diagnosed with chronic sinusitis, the flu, strep throat, and ultimately with asthma and potentially a sleep disorder connected with some airway obstruction.

Claimant fails to explain how any of these records would have reasonably changed the opinions given by the experts related to Claimant's severe impairments of CAH and ADHD; particularly, as the medical complaints and symptoms described in the supplemental records were nothing new. *See S.D.O. v. Colvin,* No. 1:12–cv–01815–SEB–MJD, 2014 WL 32320, at *7 (S.D.Ind. Jan. 6, 2014) (stating that a claimant fails to prove that an updated medical review is needed when he fails to illustrate how supplemental evidence weighs in favor of disability). The findings in the supplemental records related to Claimant's CAH remained stable, (Tr. at 559, 562, 566-67, 573-74, 592-93, 628-29); and her school records, which were probably the most informative records regarding Claimant's ADHD, reflected satisfactory progress in all areas. (Tr. at 250). Consequently, the later-produced records were not incongruous with the expert opinions and thus provided no reason for the ALJ to obtain an updated medical opinion.

Claimant's argument that the lack of an updated medical opinion also resulted in the ALJ failing to consider "the whole child" and the "longitudinal" effect of her impairments is equally without merit. The ALJ reviewed and discussed treatment records beginning with those prepared shortly after Claimant's birth through the supplemental records prepared by Dr. Bendre, which confirmed that Claimant was "doing well on medication to treat CAH." (Tr. at 72). The ALJ explained the process she

followed in assessing Claimant using the "whole child" approach. (Tr. at 73). She explicitly considered Claimant's severe impairments, and impairments that were not severe, and examined how Claimant functioned in each of the six equivalence domains. The ALJ took into account the testimony of Claimant's mother describing Claimant's current problems with persistent respiratory illness, poor sleep, loud snoring, chronic use of antibiotics, acts of defiance, and steroid rages. (*Id.*). She then compared the anecdotal statements to the treatment records, *specifically* highlighting how Claimant had done well on medication *over time.* (Tr. at 74). Indeed, the ALJ does an admirable job of gathering evidence from various points in time applicable to each of the six domains to develop a reliable picture of how Claimant functioned. The treatment records, the school records, and the opinion evidence were all consistent with the ALJ's findings in the six domains of functioning.

Therefore, the undersigned **FINDS** that the ALJ did not err in failing to obtain an updated medical opinion. The undersigned further **FINDS** that the ALJ considered the Claimant's impairments "longitudinally" and reached a determination that was supported by substantial evidence.

### B.     *Failure to Find Marked Limitations in Two Domains*

Claimant next argues that the ALJ committed reversible error by finding that Claimant had "less than marked" limitations in two functional domains; "attending and completing tasks" and "health and physical well-being." (ECF No. 12 at 13-17). In Claimant's view, at a minimum, the evidence supports a finding of "marked" limitations in both of these domains.

In regard to the domain of "attending and completing tasks," Claimant concedes that there is evidence supporting the ALJ's conclusion that Claimant's limitations are

less than marked. She acknowledges Dr. Carver's testimony that her hyperactivity is "situational;" that she does well "one on one;" and that she tested well in concentration. (*Id.* at 15). However, she contends that evidence to the contrary "supports a finding that [she] has a more severe limitation in this domain." (*Id.*).

As previously stated, when reviewing a final decision regarding disability benefits, the court's role is limited to examining whether the decision was reached through a correct application of the law and is supported by substantial evidence. *Hines,* 453 F.3d at 561. In performing this task, the court does not review the evidence *de novo*, and re-weigh it, evaluate the credibility of witnesses, or substitute its judgment for that of the Commissioner. *Hays,* 907 F.2d at 1456; *Mastro,* 270 F.3d at 176. Instead, the court looks at the record as a whole and assesses whether the Commissioner's findings have a sufficient evidentiary basis. "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or the [Commissioner's] designate, the ALJ)." *Walker,* 834 F.2d at 640; *see also Hays,* 907 F.2d at 1456. Thus, even if the court disagrees with the Commissioner's decision, if the law was properly applied and the findings are supported by substantial evidence, the court must adopt them. *Blalock,* 483 F.2d at 776.

With this framework in mind, the undersigned **FINDS** that the ALJ's conclusion that Claimant's limitations in this domain were less than marked is supported by substantial evidence. At the outset of her evaluation of Claimant's functioning in this domain, the ALJ discussed the types of activities that exemplify a child's ability to attend to and complete tasks, correctly relying upon SSR 09-5p and 20 C.F.R. § 416.926a. According to the ALJ, this domain focuses on a child's ability to pay attention when spoken to directly, to concentrate on tasks, prioritize, and mange time. The ALJ noted

that Claimant's concentration was found to be moderately impaired by Ms. Reynold, and she was observed to be hyperactive. However, medical records from Dr. Bendre suggested that Claimant's hyperactivity might well be linked to her excessive use of tea. (Tr. at 77). The ALJ also indicated that Dr. Carver found Claimant to function well in a one-on-one setting. Indeed, Dr. Carver testified at the administrative hearing that evidence of Claimant's ADHD was "inconsistent." (Tr. at 94). Dr. Carver pointed out that Claimant acted up at the psychological examination primarily when her mother and sister were in the room, but when they left, she was able to sit still long enough to concentrate and do well on her intelligence testing. He also emphasized that Claimant had no remarkable problems with hyperactivity or attention deficits that were documented by her teacher. Jerry Sapp, Claimant's kindergarten teacher, completed a questionnaire, and marked only one activity in the domain of "attending and completing tasks" as being limited. (Tr. at 242-49). Mr. Sapp indicated that Claimant had a "slight problem" completing work accurately without careless mistakes. He wrote that on a daily basis Claimant reversed some numbers and letters when writing them. (Tr. at 244). However, Mr. Sapp did not report Claimant having any problems with concentration, disruption, lack of attention, following instructions, waiting her turn, working without distracting herself or others, finishing on time, completing her classwork, or lack of organization. Accordingly, Dr. Carver felt the situational hyperactivity displayed by Claimant was not indicative of marked impairment. (*Id.*). Considering the teacher questionnaire, the treatment records, and the opinions of the agency experts, all of whom opined that Claimant had less than marked limitations in this domain, Claimant is hard-pressed to sustain a viable argument to the contrary.

Similarly, Claimant's contention that the ALJ failed to appreciate the cumulative

effect of her long-term, and often high-dose, steroid therapy is unpersuasive. The ALJ explained that the domain of "health and physical well-being" considered "the cumulative physical effects of physical and mental impairments and any associated treatments or therapies on a child's health and functioning ... [this] domain addresses how recurrent illness, the side effects of medication, the need for ongoing treatment affect the child's health and sense of physical well-being." (Tr. at 81). Clearly, the ALJ understood that this domain, unlike the others, does not focus on the child's abilities; rather, it examines how the child's overall condition is affected by the demands of his or her impairments. As Claimant points out, the concept of "medical fragility" is recognized in this domain, and is a state of appearing to function appropriately, but requiring intensive medical or other care to do so. SSR 09-8p, 2009 WL 396030, at *2 (S.S.A. Feb. 17, 2009). Of course, the severity rating given to a limitation in this domain is reached by measuring its frequency, duration, and impact. Accordingly, Claimant does not show a "marked limitation" simply by stating that her disease process requires the use of steroids, and long-term steroid use often results in damage to bones and organs. Rather, Claimant must show the current presence of a *serious* impairment of health or functioning from the use of steroids, i.e. a limitation that is "more than moderate," or:

> For the sixth domain of functioning, "Health and physical well-being," ... [you also] have a "marked" limitation if you are frequently ill because of your impairment(s) or have frequent exacerbations of your impairment(s) that result in significant, documented symptoms or signs. For purposes of this domain, "frequent means that you have episodes of illness or exacerbations that occur on an average of 3 times a year, or once every 4 months, each lasting 2 weeks or more. [You may also] have a "marked" limitation if you have episodes that occur more often than 3 times in a year or once every 4 months but do not last for 2 weeks, or occur less often than an average of 3 times a year or once every 4 months but last longer than 2 weeks, if the overall effect (based on the length of the episode(s) or its frequency) is equivalent in severity.

20 C.F.R. 416.926a(e). Claimant suggests that her CAH causes her to have upper respiratory infections that require the use of more steroids, and the steroids are threatening her growth, development, and bone health. Nevertheless, through the time frame of the written decision, substantial evidence supports the ALJ's conclusion that Claimant's limitations in the domain of health and well-being were less than marked. The ALJ was particularly persuaded by Claimant's school records, which demonstrated a lack of excessive absenteeism, and the absence of medications and treatments rendered during the school day. (Tr. at 81, 248, 250). The ALJ also noted that Claimant had undergone successful surgery as a child, and was being treated with cortisol for her CAH. (Tr. at 81).

Moreover, neither the treatment records, nor the school records substantiate Claimant's contention that her health and well-being were markedly limited as of June 5, 2012 by her "reactive conditions and intensive steroid dosing." (ECF No. 12 at 17). Although Claimant had a couple of respiratory episodes in the Fall of 2011 and a couple more in March 2012, none of these required extended hospitalizations or care. Claimant was treated with high doses of steroids for several days, given nebulizer treatments, and antibiotics, and she responded quickly to treatment. Some records submitted to the Appeals Council after the ALJ's decision indicate that Claimant was later diagnosed with a severe Chiari 1 malformation of her brain and had additional treatment related to her CAH and asthma, but those records were not relevant to the time frame at issue. In fact, the Appeals Council returned to Claimant a portion of the records submitted to it, and advised Claimant to apply for benefits again if she believed that her condition deteriorated after the date of the ALJ's decision. (Tr. at 2).

Having considered the whole record through the date of the ALJ's written

decision, the undersigned **FINDS** that substantial evidence supports the ALJ's determination that Claimant had less than marked limitations in the domain of health and well- being during the time period in question. However, even if Claimant were given the benefit of the doubt in this domain and found to have marked limitations, any error by the ALJ would be harmless and would not merit remand. In order to prove functional equivalence, Claimant is required to show marked limitations in two domains of functioning, or extreme limitations in one domain. 20 C.F.R. § 416.926a(d). Claimant does not suggest that she has extreme limitations in any domain, nor does the evidence substantiate such a finding. Furthermore, she is wholly unable to show marked limitations in any other domain. Consequently, the undersigned **FINDS** that the Commissioner's decision denying Claimant's application for benefits is based upon a correct application of the law and is supported by the record.

## VIII.  <u>Proposal and Recommendations for Disposition</u>

Based on the foregoing, the undersigned United States Magistrate Judge respectfully **PROPOSES** that the presiding District Judge confirm and accept the findings herein and **RECOMMENDS** that the District Judge **DENY** Plaintiff's Motion for Judgment on the Pleading, (ECF No. 12), **GRANT** Defendant's Motion for Judgment on the Pleading, (ECF No. 15); **AFFIRM** the decision of the Commissioner, **DISMISS** this action, with prejudice, and remove it from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable Thomas E. Johnston, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (mailing) from the

Case 6:13-cv-23203 Document 16 Filed 09/23/14 Page 32 of 32 PageID #: 841

date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing party, Judge Johnston and Magistrate Judge Eifert.

The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

**FILED**: September 23, 2014

Cheryl A. Eifert
United States Magistrate Judge

- 32 -